# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| RANDY GOLDEN, | * | |
| Plaintiff | * | |
| v | * | Civil Action No. RDB-17-3264 |
| DR. ASHRAF MAHBOOB, M.D, *et al.*, | * | |
| Defendants | * | |

***

## MEMORANDUM OPINION

The pro se Plaintiff Randy Golden filed the above-captioned civil rights action alleging he was denied adequate medical care. ECF No. 1. Defendants filed a Motion to Dismiss or, in the Alternative, for Summary Judgment. ECF No. 12. Plaintiff filed an opposition (ECF No. 17) to which Defendants replied (ECF No. 19). The matter is now ripe for review. The Court finds a hearing in these matters unnecessary. *See* Local Rule 105.6. For the reasons that follow, despite liberally construing Plaintiff's submissions, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), Defendants' dispositive Motion, construed as a Motion for Summary Judgment, is GRANTED.

### I. Factual Background

Plaintiff Randy Golden, a state inmate, currently confined at the North Branch Correctional Institution (NBCI), alleges in his verified complaint that he received constitutionally inadequate medical care while incarcerated at Western Correctional Institution (WCI). ECF No. 1. In support of their motion, Mahboob Ashraf, M.D., Krista Self (f/n/a Bilak), N.P., Kristi Cortez, R.N., and Holly Pierce, N.P. submitted various exhibits, including the affidavit of Asresahegn Getachew, M.D., Medical Director at WCI, (ECF No. 12-5) and relevant portions of Golden's medical records. ECF No. 12-4. The material facts are not in dispute.

On December 16, 2016, Golden was stabbed in the back of the neck, left chest, and both arms while an inmate at WCI. ECF No. 12-5, ¶ 5; ECF No. 12-4 at p. 2. He was taken to the Western Maryland Health Systems Emergency Room for treatment, which included the suturing and stapling of his wounds. ECF No. 12-5, ¶ 5; ECF No. 12-4 at p. 2. Golden also received a tetanus shot and cephalosporin IV. ECF No. 12-5, ¶ 5; ECF No. 12-4 at p. 2. He returned to WCI the same day and was admitted to the infirmary for observation. ECF No. 12-5, ¶ 5; ECF No. 12-4 at p. 3. It was noted that the emergency room records showed that Golden's urine tested high for opioids but he had not been prescribed opioids prior to his admission. ECF No. 12-4 at p. 3. While in the infirmary he was prescribed Tylenol with Codeine until December 22, 2016, and also had prescriptions for muscle rub and Baclofen. *Id.*

He was discharged from the infirmary back to his housing unit on December 17, 2016. ECF No. 12-4 at p. 5. The nursing notes indicate that the "Infirmary Discharge Notification email [was] sent to appropriate supervisory staff." *Id.* Although Golden had an active prescription for Tylenol with Codeine, the nursing notes indicated that he would be discharged with Tylenol 325 mg. 2 tablets every 6 hours for discomfort. ECF No. 12-4 at p. 7. Golden was directed to follow up with the physician on December 22, 2016. *Id.*

For unknown reasons, over the next 5 days Golden was not provided with the Tylenol-Codeine medication. ECF No. 12-5 at ¶ 7. Golden states that on December 17, 2016, he told Nurse Cortez that he was in pain and asked why he had not received his prescribed Tylenol with Codeine. ECF No. 1 at p. 3. He alleges that Cortez advised him that the prescription was only for the previous night and that he would continue to feel pain for a few days but it would go away. *Id.* Before leaving the infirmary and returning to NBCI, Golden saw Nurse Pierce. He inquired about

2

his pain medication but she told him that he did not need any and that Nurse Bilak would take care of him. *Id.*

Golden was seen in the medical department at NBCI on December 18, 2016. His wounds were examined, and bacitracin and a band aid applied to his left upper arm. ECF No. 12-4 at p. 8. Golden alleges that during this appointment he told Nurse Evan, a medical provider not a party to these proceedings, that he was in pain. Golden alleges that she expressed shock that he was not receiving pain medication and indicated that she would speak with Bilak. ECF No. 1 at p. 3. No notes were made in Golden's medical record that he complained of pain during this appointment. Further, the record reflects that he had active prescriptions for the Tylenol-Codeine, muscle rub, and Baclofen at the time of the appointment. ECF No. 12-4 at p. 8.

Golden submitted a sick call slip on December 21, 2016, complaining of severe pain in both arms, chest, both sides of his neck, left hand and head. ECF No. 12-4 at p. 10. He also indicated he was told he was going to receive antibiotics but had not received them. *Id.* He was seen the following day by Krista Bilak, RNP. ECF No. 12-4 at p. 11. His sutures and staples were removed, the incisions cleaned and treated with antibiotic ointment. *Id.* Golden complained of pain. Due to his having tested positive for opiates in the emergency room, he was provided with Naproxen for pain relief. *Id.* He also had a valid prescription for muscle rub. *Id.* at p. 12.

Golden submitted another sick call slip on December 28, 2016, stating that he was trying to get his medication renewed for his foot. ECF No. 12-4 at p. 13. He also complained of severe pain and reported that the Naproxen was not working for his stab wounds. *Id.* He was evaluated on December 30, 2018. Despite being ambulatory, he reported that he could not plant his foot on the floor due to pain. *Id.* at p. 14. No swelling or tenderness was observed, however bruising on

3

the inner heel was seen. *Id.* He was referred to the provider for further treatment, directed to apply ice and heat, and to immobilize the injury. *Id.*

Golden filed another sick call request on January 13, 2017, again complaining of pain in his neck, arms, chest, and the back of his head. ECF No. 12-4 at p. 15. Golden was examined by Bilak on January 18, 2017. *Id.* at p. 16. He reported numbness at the site of the stab wound in his right upper arm. *Id.* Bilak noted that the laceration had healed and Golden had equally strong grips. She noted that the "[p]ain [was] not consistent with nature of stabbing." *Id.* Golden reports that Bilak told him that she would not give him narcotics and "if he was uptown he wouldn't even went to hospital [sic]." ECF No. 1 at p. 3. He was directed to continue taking his prescribed Naproxen and to increase his activity level. ECF No. 12-4 at p. 15.

Despite Golden's wounds having healed, on February 11, 2017, he filed another sick call slip again complaining of pain. ECF No. 12-4 at p. 18. He indicated that when he laid down he had pain in the back of his head. *Id.* On February 14, 2017, Baker examined Golden. She noted that Golden previously advised the provider that Naproxen did not work but the provider found no indication for other pain medication. ECF No. 12-4 at pp. 18-19. Baker provided Golden with Motrin and compresses and directed him to follow-up if necessary. *Id.* Golden's prescription for Naproxen expired on January 23, 2017. ECF No. 12-4 at p. 21.

Golden filed a sick call slip on March 17, 2017, complaining of pain at his wound sites. ECF No. 12-4 at p. 21. He was seen that day by Baker who observed Golden walking with a steady gait and getting on and off the exam table without difficulty. *Id.* at p. 22. He reported pain in his head, arms, and neck as 9 out of 10. *Id.* His prescription for Naproxen was renewed. *Id.*

Golden's next sick call slip was filed on April 4, 2017. ECF No. 12-4 at p. 24. At that time, he complained of pain in his right ankle, explaining that sometimes his ankle would go numb

4

and he had no feeling. *Id.* He was seen by Bilak on April 9, 2017. *Id.* at p. 25. She noted that Golden walked without a limp and observed no swelling or bruising. Bilak also noted that Golden had a history of opiate abuse and that Neurontin and Tramadol were not indicated. *Id.* Dr. Getachew avers that given Golden's "history of opioid abuse, careful consideration should be given before prescribing any narcotic opioids or other drug susceptible to abuse such as Tramadol and Neurontin." ECF No. 12-5, ¶ 10. Golden's prescription for Naproxen was renewed and he was also prescribed Extra Strength Tylenol. ECF No. 12-4 at p. 25.

Golden filed sick call slips on April 26, 2017 and May 6, 2017. ECF No. 12-4 at pp. 27-28. He complained of severe pain all over his body and indicated that the Naproxen and Tylenol were not working and were upsetting his stomach. *Id.* He was seen by Baker on May 9, 2017. *Id* at p. 29. She noted that Golden walked without difficulty and was able to get on and off the table without difficulty. She further noted that in April, Bilak found that there was no indication for Tramadol or Neurontin. Golden was educated and his prescriptions for Naproxen and Extra Strength Tylenol continued. *Id.*

Baker again saw Golden on June 3, 2017, this time in response to his May 31, 2017 sick call wherein he complained of pain at the site of his healed stab wounds and indicated he needed treatment for his keloids. ECF No. 12-4 at pp. 31-32. Baker noted that Golden's prescriptions were due to expire soon and she would refer him to the provider due to his continued complaints of pain. *Id.* at p. 32.

Dr. Ashraf examined Golden on June 8, 2017. ECF No. 12-4 at p. 34. At that time, Golden complained of low back pain. He reported he had a keloid on his arm and head which formed after his injury and which caused him discomfort and pain. *Id.* Golden advised Ashraf that the Naproxen caused him stomach upset. Golden was assessed as having keloids at the stab wound

5

sites on his neck. ECF No. 12-5, ¶ 11.[1] *Id.* Ashraf indicated he would prescribe Cymbalta which was a pain-relieving medication. ECF No. 12-4 at p. 34. Getachew avers that "Cymbalta is a particularly appropriate medication to treat neuropathic pain from keloid sites (the analgesic efficacy of opioids in chronic neuropathic pain is subject to considerable uncertainty). ECF No. 12-5, ¶ 11. Golden's prescription for Extra Strength Tylenol was continued (ECF No. 12-4 at p. 35) and Ashraf submitted the request for the non-formulary drug Cymbalta that same day. *Id.* at p. 36.

On July 2, 2017, Golden filed a sick call slip stating that he was in severe pain and that the medication was not working. ECF No. 12-4 at p. 37. He also indicated that he needed treatment for his keloids and asked when he would receive steroid injections for the treatment of the keloids. *Id.* Golden was evaluated by Nurse Stacy on July 7, 2017, who indicated she could not do anything for him since he had recently been seen by Dr. Ashraf. ECF No. 1 at p. 4. Dr. Ashraf examined Golden on July 11, 2017. ECF No. 12-4 at p. 38. Golden reported that the Cymbalta was not working and did not decrease his pain. *Id.* Golden asked about steroid injections and Ashraf advised that he would prescribe something else for pain management. ECF No. 1 at p. 5. Golden agreed with the plan of treatment. ECF No. 12-4 at p. 38. As such, Ashraf discontinued the Cymbalta and prescribed Baclofen. *Id.* Golden's prescriptions for muscle rub and Extra Strength Tylenol were also continued. *Id.* at p. 39.

Stacie Mast, RN, examined Golden on July 28, 2017, in response to his sick call slip dated July 26, 2017, complaining of severe pain and seeking treatment for his keloids. ECF No. 12-4 at pp. 40-41. Golden states that Mast told him she had never heard of anyone complaining that

---

[1] "A keloid is an abnormal proliferation of scar tissue that forms at the site of cutaneous injury (e.g., on the site of a surgical incision or trauma); it does not regress and grows beyond the original margins of the scar.[)]"( ECF No. 12-5 ¶ 11).

6

acetaminophen upset their stomach. ECF No. 1 at p. 5. At that time, Golden had valid prescriptions for muscle rub, Extra Strength Tylenol and Baclofen. He reported that the Tylenol upset his stomach and that the medications were not working. ECF No. 12-4 at p. 41.

Golden was examined by Krista Self, RNP on August 14, 2017. ECF No. 12-4 at p. 43. She noted three small raised keloids on the back of Golden's scalp. He reported that when he was brushing his hair or having his hair trimmed the keloids became painful and often bled. They were tender to palpation. She referred Golden to a provider to have the keloids injected. *Id.* Getachew avers that "[a]nti-inflammatory treatment such as corticosteroid injections have been found efficacious in treating keloid pain and reducing the keloid." ECF No. 12-5, ¶ 12. At that time, Golden continued to have active prescriptions for muscle rub, Extra Strength Tylenol and Baclofen. ECF No. 12-4 at p. 43.

On September 2, 2017, Ali Yahya, MD injected cortisol into Golden's keloid scar. ECF No. 12-4 at p. 45. Yahya noted that Golden tolerated the procedure well and was to be scheduled every month for three months for further injections.[2] *Id.* Golden continued to have active prescriptions for muscle rub, Extra Strength Tylenol, and Baclofen. *Id.*

On November 18, 2017, Golden submitted a sick call slip again complaining of severe pain where he was stabbed and stating that he was not prescribed anything for the pain related to the keloids. ECF No. 12-4 at p. 46. He was seen on November 20, 2017, by Mast who noted that he had no active complaints of pain and was able to move without difficulty. He reported chronic discomfort form the keloids and requested another steroid injection. *Id.* at p. 47.

Getachew avers that in regard to keloids, Golden "needs to understand that the keloid will likely never entirely disappear but is likely to become less symptomatic and flatter." ECF No. 12-

---

[2] In his opposition response, Golden indicates that he did not receive his second steroid injection until March of 2018. ECF No. 17.

7

5, ¶ 13. He further states that in his opinion, to a reasonable degree of medical probability, Golden is receiving appropriate care for his keloid condition. *Id.* at ¶ 14.

## LEGAL STANDARD

Defendants have filed Motions to Dismiss, or, in the Alternative, for Summary Judgment. Typically, when deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court considers only the complaint and any attached documents "integral to the complaint." *Sec'y of State for Defense v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007). To the extent that grounds for dismissal are based solely on the contents of the Complaint, the Court may dismiss under Rule 12(b)(6) if the complaint does not allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when the facts pled allow "the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Although courts should construe pleadings of self-represented litigants liberally, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), legal conclusions or conclusory statements do not suffice, *Iqbal*, 556 U.S. at 678. The Court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cty.*, 407 F.3d 266, 268 (4th Cir. 2005).

Rule 12(d) requires courts to treat a Rule 12(b)(6) motion as a motion for summary judgment where matters outside the pleadings are considered and not excluded. Fed. R. Civ. P. 12(d). Before converting a motion to dismiss to one for summary judgment, courts must give the nonmoving party "a reasonable opportunity to present all the material that is pertinent to the motion." *Id.* "Reasonable opportunity" has two requirements: (1) the nonmoving party must have some indication that the court is treating the Rule 12(b)(6) motion as a motion for summary

judgment, and (2) the nonmoving party "must be afforded a reasonable opportunity for discovery" to obtain information essential to oppose the motion. *Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985) (citation omitted). Here, the notice requirement has been satisfied by the title of the Motions. To show that a reasonable opportunity for discovery has not been afforded, the nonmoving party must file an affidavit or declaration under Rule 56(d) explaining why "for specified reasons, it cannot present facts essential to justify its opposition," Fed. R. Civ. P. 56(d), or otherwise put the district court on notice of the reasons why summary judgment is premature. *See Harrods, Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244-45 (4th Cir. 2002). Here, Plaintiff has not filed a Rule 56(d) affidavit or otherwise requested discovery in this matter, nor has he submitted an Opposition to Defendants' Motions, which contain relevant record evidence also provided to Plaintiff. Under these circumstances, the Court will construe Defendants' Motions as Motions for Summary Judgment.

Under Federal Rule of Civil Procedure 56, the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the motion, the Court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 411 U.S. 242, 255 (1986). The Court may rely only on facts supported in the record, not simply assertions in the pleadings. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). The nonmoving party has the burden to show a genuine dispute on a material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute of material fact is only "genuine" if sufficient evidence favoring the

nonmoving party exists for the trier of fact to return a verdict for that party. *Id.* at 248-49.

Because he is proceeding pro se, Plaintiff's submissions are liberally construed. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Nonetheless, this Court must also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted).

## DISCUSSION

Plaintiff's claims regarding denial of medical care, are governed by the Eighth Amendment of the United States Constitution which prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)). In order to state an Eight Amendment claim for denial of medical care, a plaintiff must show that the actions of the defendants' or their failure to act amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). "Deliberate indifference is a very high standard—a showing of mere negligence will not meet it. . . . [T]he Constitution is designed to deal with deprivations of rights, not errors in judgment, even though such errors may have unfortunate consequences." *Grayson v. Peed*, 195 F.3d 692, 695-96 (4th Cir. 1999). "Deliberate indifference requires more than ordinary lack of due care for the prisoner's interests or safety." *Id.* at 696 (internal quotation marks omitted).

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Objectively, the medical condition

at issue must be serious. *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992). A medical condition is serious when it is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). Proof of an objectively serious medical condition, however, does not end the inquiry.

The subjective component is satisfied only where a prison official "subjectively knows of and disregards an excessive risk to inmate health or safety." *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014); *see also Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997) ("True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk."). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Center*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844). "Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 105-06; *see also Jackson*, 775 F.3d at 178 ("[M]any acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference.").

As to Golden's claim that he has been denied constitutionally adequate medical care, the certified medical records submitted by Defendants plainly refute this assertion. Regarding Golden's specific claim that he did not receive his prescribed Tylenol with Codeine, while it is true that Golden was prescribed Tylenol with Codeine for five days after his stabbing and for unspecified reasons did not receive the medication, the Court concludes that Golden cannot

11

establish the subjective element of a deliberate indifference claim as to any of the named Defendants.

In an effort to hold Cortez and Pierce liable for the failure to receive his prescribed medication, he alleges that on December 17, 2016, the day he was being discharged from the infirmary at WCI back to his housing unit at NBCI, Cortez told him that the Tylenol with Codeine was only prescribed for the previous night. He also claims that Pierce told him he did not require pain medication and Bilak would "take care of him." The medical records reflect that on that day, in preparation for his discharge from the infirmary, Pierce entered a note that Golden was prescribed Tylenol 325 mg, two tablets every six hours for pain. ECF No. 12-4 at p. 6. It is unclear whether the regular Tylenol was intended to replace the Tylenol with Codeine, however it is undisputed that the Tylenol with Codeine prescription was not discontinued and remained valid. Additionally, at the time of discharge Golden had an active prescription for Baclofen, a muscle relaxer and pain reducer, which he received, and which remained valid until January 21, 2017. ECF No. 12-4 at p. 7.

Before Golden was discharged to his housing unit, he was advised of the sick call process and the nursing hand off form and infirmary discharge notification were faxed and emailed, respectively, to the appropriate staff at NBCI. ECF No. 12-4 at p. 5. Golden returned to NBCI that day. He was seen the following day at NBCI at nurse sick call and his wounds were treated. There is no indication that he advised that nurse that he was not receiving prescribed pain medication, or that the medication he was receiving (Baclofen) was insufficient to treat his pain. He was seen by Bilak on December 22, 2016, and, given his complaints of pain, was prescribed an additional pain reliever, Naproxen.

12

Golden does not allege that Pierce or Cortez were responsible for his health care once he returned to NBCI. Pierce and Cortez both treated Golden while he was housed in the WCI infirmary. It is clear that when he was discharged from the infirmary he had active prescriptions for Tylenol-Codeine and Baclofen. There is no indication in Golden's Complaint, or elsewhere in the record before the Court, that either Cortez or Pierce were aware that Golden failed to receive his prescribed medication once he returned to NBCI. Taking Golden's allegations as true, their stated beliefs that the prescription for Tylenol-Codeine was only for one day is contradicted by the record and does not explain why Golden failed to receive the prescribed medication once he returned to his housing unit. While Cortez and Pierce's beliefs about the validity of Golden's prescription appear to have been erroneous, there is simply no indication that either of them took deliberate action to discontinue the prescription or to prevent Golden from receiving same. As such, they are entitled to summary judgment on this claim.

Bilak and Ashraf are likewise entitled to summary judgment on this issue. Golden does not allege that Bilak or Ashraf were involved in the denial of the Tylenol with Codeine prescription. Additionally, it is undisputed that when Bilak evaluated Golden on December 22, the date the prescription expired, she prescribed him additional analgesic medication.

As to Golden's complaint that he is not receiving medical treatment for his keloids, Golden has not identified any specific incident in which his medical needs have been disregarded, nor has he tied this claim to any particular named medical provider. As summarized in the Background Section, Plaintiff's unrefuted medical record shows that he has been repeatedly evaluated and treated by institutional providers, housed in the infirmary, and received appointments and procedures with providers. The record makes clear that Golden has been regularly seen and that in light of his subjective reports of pain, which were not supported by objective observations, and

history of opioid abuse, the providers acted to provide appropriate treatment. He received wound care and analgesic medication. When the keloids developed several months after the stabbing, he received additional analgesic medication which proved unhelpful and ultimately he was provided steroid injections to treat the symptoms of the keloids.[3]

The evidence viewed in the light most favorable to Golden establishes that he received constitutionally adequate medical care. When viewing the evidence as a whole and in the light most favorably to him, no evidence exists that the conduct alleged amounted to deliberate indifference on behalf of the named medical providers. *See Estelle*, 429 U.S. at 105-06 (holding that an inadvertent failure to provide adequate medical care does not amount to deliberate indifference). Indeed, "[d]isagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged." *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (citing *Gittlemacker v. Prasse*, 428 F.2d 1, 6 (3rd Cir. 1970)). No exceptional circumstances exist here.

## IV. CONCLUSION

For the foregoing reasons, Defendants' dispositive Motion, construed as a Motion for Summary Judgment, will be GRANTED and judgment will be ENTERED in favor of Defendants and against Plaintiff. A separate Order follows.

---

[3] The Court is mindful that Golden alleges in his opposition response that he failed to receive timely subsequent injections to treat his keloids. Because a memorandum in opposition to a motion is not a proper vehicle for amending a complaint or adding new claims, these additional claims will not be considered. *See Cutrera v. Board of Sup'rs of Louisiana State University*, 429 F.3d 108, 113-14 (5th Cir. 2005) (holding that a claim raised not in the complaint but in response to a motion for summary judgment is not properly before the court); *Gilmour v. Gates, McDonald and Company*, 382 F.3d 1312, 1315 (11th Cir. 2004); *see also Woodbury v. Victory Van Lines*, 286 F. Supp. 3d 685, 692 (D. Md. 2017). Moreover, Golden has failed to allege how any of the named Defendants were responsible for the delay in treatment. If Golden believes his rights were violated regarding the delayed steroid injections he is free to file a new civil rights complaint naming the appropriate Defendants.

Date: February 6, 2019

/s/ Richard D. Bennett
RICHARD D. BENNETT
UNITED STATES DISTRICT JUDGE